**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| ALBERT M. CALLAND III and | ) | |
| CYNTHIA K. CALLAND, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 9:14-cv-0420-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| LLOYD H. CARR, *personally and as* | ) | |
| *Trustee of the Lloyd H. Carr Trust dated* | ) | |
| *June 17,* 1998, LAURIE K. CARR, and | ) | |
| LLOYD H. CARR TRUST, *dated June 17,* | ) | |
| *1998,* | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment. For the reasons stated below, the court grants defendants' motion.

## I.  BACKGROUND

This case is more notable for its illustrious cast of characters than for its mundane storyline. That cast includes plaintiffs Albert M. Calland III ("Albert") and his wife Cynthia K. Calland ("Cynthia") (collectively, the "Callands"), who purchased a Hilton Head Island home from defendants Lloyd Carr ("Lloyd") and his wife Laurie K. Carr ("Laurie") (collectively, the "Carrs"). Albert served in the United States Navy for 33 years, during which he served as the commander of all Special Operations Forces in Afghanistan, commanding officer of the Naval Special Warfare Command, and ultimately Deputy Director of the CIA. Lloyd was the head football coach at the University of Michigan for thirteen years, leading the Wolverines to 122 wins, five Big Ten championships, and the 1997 national championship. The dispute between the

1

Callands and the Carrs arises from a musty odor in the home allegedly resulting from water infiltration, mold, and mildew.

The Carrs had experienced a variety of problems with the home prior to putting it on the market. In 2007, Laurie noticed moisture around one of the windows. Laurie Dep. 16:3-13. After testing revealed the presence of black fungi and moisture readings of 20% near the windows, Pls.' Resp. Ex. B, the Carrs hired a contractor to remove and replace the stucco. Laurie Dep. 18:7-10. Following a rainstorm in 2008, a friend of the Carrs, Spain Kelley, observed a leak in the kitchen ceiling. Laurie Dep. 22:9-10. The Carrs hired a contractor to replace the roof, gutter system, and a portion of the kitchen ceiling. Laurie Dep. 22:1-8.

Finally, as they were preparing to sell the house, in the summer of 2010, their real estate agent Kevin King suggested that they make some repairs prior to putting the home up for sale. Laurie Dep. 25:3-8. ServPro did remediation in the garage area, and after remediation was done, the Carrs had foam insulation and microbial preventive spray sprayed on it as a preventive measure. Laurie Dep. 25:22-26:3. The Carrs also retained a specialist to test the home for mold and mildew. On November 1, 2010, SanAir Technologies produced a report, which indicated a presence of mold in the garage, the HVAC room, storage room, and the basement/family room. Pls.' Resp. Ex. H. ServPro used these tests to see where they needed to perform remediation work. Neumann Dep. 53:16-55:10. There is no evidence that the Carrs ever received the SanAir report.

As Albert's career was wrapping up, the Callands decided to look for a retirement home on Hilton Head Island. Cynthia Dep. 10:18-25. At the recommendation of their friends Lori and Jim Queen ("the Queens"), who lived on Hilton Head Island, the

Callands sought the services of real estate agent Steve Timperman ("Timperman") of Charter One Realty. Id. at 11:16-12:2. In late 2010, Timperman showed them a number of homes, including the Carrs' home at 57 Yorkshire Drive.[1] Timperman Aff. ¶¶ 2, 4; Cynthia Dep. 12:16-13:16. While visiting the Carrs' home, Albert and Lloyd spoke for between five and ten minutes, mostly about football and not the condition of the house. Albert Dep. 14:16-15:23. The Callands came back later in the day after the Carrs had left. Cynthia Dep. 14:7-15:18. The Callands spent between 10 minutes and an hour on this initial visit to the home. Cynthia Dep. 21:11-18; Albert Dep. 17:15-24. Though the Callands liked the house, the first thing they noticed was a musty odor that "smelled like mold or mildew." Cynthia Dep. 15:22-16:4.

The Callands made an offer on the house without returning for another visit. Cynthia Dep. 26:21-23. The offer was contingent on the Carrs addressing the musty odor to the Callands' satisfaction before closing and the Callands being satisfied with the results of a home inspection. Cynthia Dep. 69:5-70:18. The Carrs contacted ServPro, who recommended that foyer wood flooring be taken up and replaced. Cynthia Dep. 113:14-115:8; Timperman Aff. ¶ 6. The Carrs ultimately contracted with RCH Construction to replace the foyer subfloor and seal and treat the foyer floor with a lacquer. Timperman Aff. ¶¶ 6, 12. RCH Construction also installed new hydrostatic vents in the lower level of the home. Timperman Aff. ¶ 6. In addition, ServPro cleaned and treated the air conditioning ducts with a disinfectant. Timperman Aff. ¶ 6. The Carrs paid for all of the repairs. Cynthia Dep. 118:6-13.

---

[1] The home was owned by the Lloyd H. Carr Trust with Lloyd as the trustee. Defs.' Mot. Ex. 28.

On November 22, 2010, the Carrs filled out a South Carolina Residential Disclosure Statement.  Defs.' Mot. Ex. 22.  The Carrs indicated on the disclosure statement that they had no knowledge of any problem (malfunction or defect) with the "foundation, slab, fireplaces/chimneys, floors, windows, doors, ceilings, interior and exterior walls, attached garage, patio, deck, or other structural components" of the home. Id.  Additionally, they indicated that they had no knowledge of any "leakage or other problem" with the roof, and no knowledge of any "water seepage, leakage, dampness or standing water, or water intrusion from any source in any area of th[e] structure."  Id. Finally, they indicated that had no knowledge of any "environmental hazards," including "toxic mold or other hazardous or toxic material."  Id.  The Callands acknowledged receiving the disclosure statement on February 1, 2011.  Id.

Cynthia testified that at the time of closing, she was satisfied with the condition of the home, including the requirement that the musty mildew odor in the foyer had been addressed and eliminated.  Cynthia Dep. 28:13-29:5, 70:13-18, 95:16-25.  Although Cynthia expressed concerns that the odor would return, she did not seek to delay the closing to see if it would.  Cynthia Dep. 29:6-30:5.  Instead, she relied on Timperman's opinion that ServPro had "got it" and that the house was in appropriate condition for them to close.  Cynthia Dep. 30:8-13, 95:20-23.

At the recommendation of the Queens, the Callands hired Lynes Home Inspection to inspect the home.  Cynthia Dep. 89:12-90:13.  Brad Tholen, the inspector from Lynes, found a number of areas with mold and mildew, found moisture trails indicating that water had leaked from behind the stucco, noted that the two ventilation fans in the foundation area were not functioning, observed the foyer undergoing a treatment

4

involving humidifier, and noted that drywall had been removed for the application of spray foam insulation. Tholen Aff. ¶ 10. Tholen included his observations in a report, in which he recommended that the Callands hire a professional to determine the extent of the problems before closing. Tholen Aff. ¶¶ 10, 11; Defs.' Mot. Ex. 6. The Callands decided not to have the issues further evaluated. Cynthia Dep. 99:11-25; Tholen Aff. ¶ 9. Rather, they simply asked the Carrs to address the mold discovered, which Cynthia indicated was remedied to her satisfaction. Cynthia Dep. 106:12-107:13.

Timperman visited the home after Tholen issued the inspection report and found additional areas of moisture damage that he called to Tholen's attention. Timperman Aff. ¶ 8. Tholen returned to the house, confirmed the additional water damage, and advised the Callands to have additional evaluation done by a licensed building contractor before closing. Tholen Aff. ¶¶ 12-13. Tholen included his findings in an addendum inspection report. Defs.' Mot. Ex. 24. The Callands did not contact a building contractor following this supplemental report. Cynthia Aff. 110:19-111:2.

In addition to the inspection report, the Callands also received an Official South Carolina Wood Infestation Report ("CL-100") before closing. Defs.' Mot. Ex. 23; Cynthia Dep. 79:2-80:17. The CL-100 indicated evidence of "active wood destroying fungi (wood moisture content 28% or above)" and "excessive moisture conditions below the first main floor (20% or above, wood moisture content, standing water, etc.)." Id. The CL-100 notes that "fungi damage" is commonly called "water damaged wood, rot or decay." Id. The Callands relied on Timperman's advice that "most of the houses in the lowcountry have some degree of wood rot and moisture" and did not delay closing because of the CL-100. Cynthia Dep. 86:1-87:21.

On March 25, 2011, the Callands closed on the house.  They went back to Virginia following closing, leaving the house vacant.  Cynthia Dep. 119:4-9.  The next time the Callands visited was in June 2011.  Cynthia Dep. 121:5-7.  Between March and June, Lori stopped by the home occasionally to check on it.  Cynthia Dep. 122:5-11.  Cynthia does not remember Lori reporting any issues with the house.  Cynthia Dep. 123:12-20.  When the Callands returned in June, Cynthia could "smell the smell" again.  Cynthia Dep. 124:20-24.

The Callands moved into the home permanently in July 2012, after having renovation work done between February and June 2012.  Cynthia Dep. 133:14-134:5, 148:20-149:17.  At some point in 2012, the Callands discovered mold in two rooms in the basement.  Cynthia Dep. 130:21-131:2.  Additionally, a contractor found "a little bit" of mold behind a piece of molding.  Cynthia Dep. 153:3-8.

In October 2013, the Callands' attorney wrote to the Carrs, seeking to rescind the sale on a claim that the Carrs had concealed "prior floods at the Home of which [they were] aware and which [they] failed to disclose."  Defs.' Mot. Ex. 10.  When the Carrs did not respond to the letter, the Callands filed suit in South Carolina state court on January 10, 2014, claiming negligent misrepresentation and seeking damages and rescission of the sales contract.  Defendants removed the case to federal court on February 18, 2014.  On October 20, 2014, defendants moved for summary judgment.  The Callands responded on November 17, 2014, and defendants replied on November 24, 2014.  This matter has been fully briefed and is ripe for the court's review.

## II.  STANDARDS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

## III.  DISCUSSION

The Carrs argue that dismissal is appropriate because there is no genuine dispute of material fact as to whether they made any false representations on the disclosure statement.  Defs.' Mot. 22.  The Carrs further contend that dismissal is warranted because the Callands cannot show that they reasonably relied on any alleged misrepresentations. Id.

"[N]egligent misrepresentation is predicated upon the transmission of a negligently made false statement."  McLaughlin v. Williams, 665 S.E.2d 667, 670 (S.C. Ct. App. 2008) (citing Armstrong v. Collins, 621 S.E.2d 368, 375–76 (S.C. Ct. App. 2005)).  To maintain a claim for negligent misrepresentation, a plaintiff must show by a preponderance of the evidence:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

Id. (citation omitted).

### A.     False Representation

As an initial matter, the court finds that the Callands have not established a genuine dispute of material fact as to whether the Carrs made any false representations about the condition of the house.  In their brief, the Callands assert that the Carrs misrepresented information about "prior repairs and problems" with the house by representing that they had no knowledge of such issues on the disclosure statement.  Pls.' Resp. 25–26.   The Carrs respond that the disclosure statement "concern[ed] only current problems, not prior repairs."  Defs.' Reply 11.  Because they had no knowledge of any current problems with the home, the Carrs argue, they did not make any misrepresentations on the disclosure statement.  Defs.' Mot. 29.  In support, they note that the disclosure statement form was later amended in 2013 to explicitly state that, when it asks generally whether the owner has "any actual knowledge of any problem" with the home, "[p]roblem includes present defects, malfunctions, damages, conditions, or characteristics."  Id. at 30; Ex. 26 at 2 (emphasis added).

8

Here, the Callands have failed to put forth sufficient evidence that the Carrs knew of current problems with the house when they filled out the disclosure statement on November 22, 2010.  Accordingly, the court finds that the Carrs' responses on the disclosure form did not constitute false representations warranting a negligent misrepresentation claim.  See Fields v. Melrose Ltd. P'ship, 439 S.E.2d 283, 285 (S.C. Ct. App. 1993) ("To be actionable, the representation must . . . be false when made.") (citation omitted).

**B.     Justifiable Reliance**

However, even if the Carrs' responses on the disclosure statement could be construed as false representations, the Court finds that the Callands could not have justifiably relied on those representations.

"[I]ssues of reliance and its reasonableness going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of facts." McLaughlin, 665 S.E.2d at 670–71 (citation omitted). Additionally, "a buyer has the right in South Carolina to rely on a seller of a home to disclose latent defects or hidden conditions which are not discoverable on a reasonable examination of the property and of which the seller has knowledge." Id. at 671. "However, while issues of reliance are ordinarily resolved by the finder of fact, 'there can be no reasonable reliance on a misstatement if the plaintiff knows the truth of the matter.'" Id. (quoting Gruber v. Santee Frozen Foods, Inc., 419 S.E.2d 795, 800 (S.C. Ct. App. 1992).  In other words, "if the undisputed evidence clearly shows the party asserting

reliance has knowledge of the truth of the matter, there is no genuine issue of material fact."[2] Id.

This case is nearly identical to McLaughlin.  In McLaughlin, the defendants indicated on a disclosure statement that they were "not aware of a malfunction or defect due to 'water seepage, leakage, dampness or standing water or water intrusion from any source in any area of the structure.'"  Id. (emphasis in original).  Following the receipt of the disclosure statement, the buyer received a home inspection report "indicating moisture damage to the exterior of the Subject Property" and a CL-100 indicating "the presence of wood-destroying fungi and a wood moisture content of 28% or more below the first main floor."  Id. at 699.  Despite having the home inspection report and the CL-100, the buyer closed on the property.  Id.  Approximately six weeks following closing, the plaintiff learned of defects in the structure of the property due to prior water intrusion and sued, arguing that the defendants' answers on the disclosure statement constituted negligent misrepresentations.  The trial court granted summary judgment, holding that because the information contained in the home inspection report and CL-100 placed the plaintiff on notice of potential moisture problems, no reasonable jury could conclude that he had a right to rely on the disclosure statement.  Id. at 671.

The South Carolina Court of Appeals affirmed, finding as a matter of law that because "[the plaintiff] had knowledge that directly contradicted the representations found in the Disclosure Statement, . . . he failed to establish the necessary element of reliance" for his negligent misrepresentation claim.  Id. at 671.  Similar to the Callands

---

[2] The South Carolina Supreme Court quoted McLaughlin's language on reliance in granting summary judgment.  Quail Hill, LLC v. Cnty. of Richland, 692 S.E.2d 499, 509 (S.C. 2010).  The court determined that the plaintiff could not have relied on the defendant's representations because he could have ascertained the correct information through the exercise of due diligence.  Id.

10

here, the plaintiff in <u>McLaughlin</u> argued that there was an issue of fact about what level of knowledge could be gained from the two reports because the home inspection report did not indicate water damage to the interior of the home and the CL-100 only indicated the presence of active wood destroying fungi.  <u>Id.</u>  The court rejected both arguments and held that because the home inspection informed the plaintiff that there was "[s]ome moisture damage," even on the outside of the home, and because the CL-100 noted that "fungi damage to wood" is "commonly called water damage," "[b]oth the Home Inspection Report and the CL-100 clearly show [the plaintiff] had information that directly contradicted the Disclosure Statement."  <u>Id.</u>

Just as the plaintiff in <u>McLaughlin</u> "could not rely on the Disclosure Statement because the Home Inspection Report and CL-100 gave him knowledge contradicting the Disclosure Statement," <u>id.</u> at 671-72, the Callands cannot show reliance on the disclosure statement.  Here, the Callands had notice of moisture problems not only from the same two sources as in <u>McLaughlin</u>, but also had additional notice of moisture from their friend Lori, their real estate agent, their own detection of a musty odor, and their knowledge that mold remediators were working on the house prior to closing.  Albert himself testified that, in hindsight, they were "knuckleheads."  Albert Dep. 28:24-29:3.

The Callands argue that the defendants in <u>McLaughlin</u> refused to answer a number of questions on the disclosure statement, whereas here the Carrs marked "no" on the relevant items.  Pls.' Resp. 26.  It is not exactly clear what the situation was in <u>McLaughlin</u>.  At one point the court notes that "several of the items [on the disclosure statement] were left blank and there were no explanations for certain items," <u>id.</u> at 699, and later the court notes that the sellers were "not aware of a malfunction or defect."  <u>Id.</u>

at 671. Regardless, the holding of <u>McLaughlin</u> is clear—once a buyer is put on notice by a Home Inspection Report and CL-100 of "some moisture damage" in a home, the buyer cannot, as a matter of law, claim reliance on the disclosure statement which contains contradictory representations. <u>Id.</u> Accordingly, the court finds that the Callands' negligent misrepresentation claim fails as a matter of law.

### IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** the Carrs' motion for summary judgment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**May 6, 2015**
**Charleston, South Carolina**